Argued and submitted September 13, reversed and remanded November 29, 1989

PROGRESSIVE CASUALTY INSURANCE CO.,
*Respondent,*

*v.*

MARCA,
*Defendant,*

*and*

SMISEK,
*Appellant.*

(88CV0218; CA A49505 (Control))

SMISEK,
*Appellant,*

*v.*

MARCA,
*Respondent.*

(87CV1138; CA A50401)
(Cases Consolidated)

783 P2d 19

James C. Coffey, North Bend, argued the cause for appellant. With him on the briefs was Hayner, Stebbins & Coffey, North Bend.

Michael A. Lehner, Portland, argued the cause for respondent Progressive Casualty Insurance Co. With him on the brief was Lehner & Mitchell, Portland.

Gig Wyatt, Salem, argued the cause for respondent Marca. On the brief was J. P. Harris, II, Salem.

Before Graber, Presiding Judge, and Riggs and Edmonds, Judges.

GRABER, P. J.

## GRABER, P. J.

These consolidated cases arise from the death of Kevan Robbins. The personal representative of Robbins' estate (the estate) claims damages for wrongful death from Marca, Robbins' employer. Progressive Casualty Insurance Co. (Progressive), Marca's liability insurer, seeks a declaratory judgment that Robbins' fatal injuries occurred in the course of his employment and were, therefore, excluded from coverage under its policy.[1] The estate intervened in the declaratory judgment action.

The parties to the declaratory judgment action tried the case to the court. They stipulated that the evidence consisted of Marca's deposition and the pertinent parts of the insurance policy. The court found "that Robbins was an employee working in the course and scope of employment for defendant Marca at the time of his death" and held that Progressive had no duty to defend or indemnify Marca in the wrongful death action. The estate appeals the declaratory judgment; Marca does not.

In the wrongful death case, the parties stipulated that the ruling in the declaratory judgment action collaterally estopped them from relitigating the issue of Robbins' employment status at the time of his death.[2] They also stipulated that "Marca was a complying employer under Oregon worker's [sic] compensation law." The court granted a summary judgment to Marca on the ground that ORS 656.018 bars the claim. The estate appeals.

We first consider the procedural questions that respondents raise. Marca argues that the stipulation in the

---

[1] The policy in effect at the time of the accident provided, in pertinent part:

"We do not cover:

"* * * * *

"(6) Bodily injury to an employee of an insured arising in the course of employment. This exclusion does not apply, however, to bodily injury to domestic employees who are not entitled to workers' compensation benefits."

See ORS 656.005(7); ORS 656.018.

[2] For the purpose of analyzing these cases, the parties agree that the phrase "arising out of and in the course of employment" in ORS 656.005(7) has the same meaning as the phrase "arising in the course of employment" in policy exclusion number 6.

wrongful death case means that the estate "agreed not to argue that [Robbins] was not an employee." In other words, according to Marca, the estate conceded the case on the merits and cannot contest the trial court's decision on appeal. Marca relies on this passage in the stipulation:

> "The parties further stipulate and agree that plaintiff is collaterally estopped from arguing, in this case, that [Robbins] was not an employee of Defendant Raymond D. Marca based upon the court's ruling in *Progressive v. Marca, supra.*"

Marca reads that sentence out of context. A stipulation is binding for the purpose for which it is intended. *McKean v. Bernard,* 54 Or App 540, 546, 635 P2d 673 (1981). In this case, the intent was simply to streamline the proceedings; the estate did not agree to the correctness of the trial court's ruling. Indeed, the stipulation noted that the estate had appealed from the judgment in the declaratory judgment action and stated that the wrongful death action was barred "unless an appellate court should overrule" the trial court. The parties contemplated that both cases could be appealed on their merits.

In the declaratory judgment action, Progressive contends that the estate cannot obtain review,[3] because the insured did not appeal. Progressive asserts that the estate's rights are only derivative; "[i]t has no direct claim against the policy." When Marca chose not to appeal, says Progressive, "the absence of coverage [was] conclusively established for all purposes." Progressive relies on *State Farm Fire & Casualty v. Reuter,* 299 Or 155, 700 P2d 236 (1985), and *Grange Insurance Association v. Beleke,* 90 Or App 416, 752 P2d 864, *rev den* 306 Or 101 (1988), neither of which considered whether a potential judgment creditor who is a party to a declaratory judgment action may challenge an adverse ruling on appeal when the insured does not. The controlling precedent is *Viking Ins. Co. v. Petersen,* 96 Or App 46, 49-50, 771 P2d 1022, *rev allowed* 308 Or 197 (1989), where we held that a potential judgment creditor who is a party to a declaratory judgment action can obtain review of a question of law, even if the insured chooses not to appeal. Marca's failure to appeal does not prevent the estate from obtaining review of the scope of insurance coverage.

---

[3] Progressive's argument is not jurisdictional; it challenges the estate's ability to obtain review of the merits of the trial court's decision.

We turn to the merits and, as a preliminary matter, define the scope of our review. The declaratory judgment action was tried on stipulated facts, Marca's deposition and provisions of the insurance policy. The deposition is internally consistent. That being so, this is a case in which the facts are undisputed.

> "The question of a person's employment status is for the trier of fact, if the facts surrounding the arrangement between the parties are in dispute. When there is no dispute, and the parties merely disagree about the legal consequences of the agreed facts, the question is one for the court." *Blacknall v. Westwood Corporation,* 89 Or App 145, 147, 747 P2d 412 (1987), *aff'd* 307 Or 113, 764 P2d 544 (1988). (Citations omitted.)

*Accord: Hendrickson v. Lewis,* 94 Or App 5, 764 P2d 577 (1988).

Robbins worked on Marca's dairy farm as a milker and general helper. On Mondays, Tuesdays, Thursdays, and Fridays, he did various chores, such as fix fences and irrigate land, from noon to 4 p.m. and milked cows from 4 p.m. to 8 p.m. On weekends, he milked from 5 a.m. to 9 a.m. and again from 4 p.m. to 8 p.m. He took Wednesdays off. For his work, Robbins received $550 per month and the use of a mobile home.

Robbins died on a Saturday, between his split shifts. Some time between 10 a.m. and 11 a.m. that day, Robbins accompanied Marca to another person's farm, several miles away, to help Marca and Marca's father salvage some lumber from a barn that was soon to be razed. Robbins and Marca had begun to dismantle the barn earlier and had worked on it together two to four times, during Robbins' regular working hours. Marca took his share of the lumber back to his farm and kept it for future farm use; some of the wood was suitable for mending fences, for instance.

This time, Marca asked Robbins for help when Robbins was at his trailer during his time off. Marca testified that it was his father's idea to finish the work then, because the barn was about to be burned:

> "I told my dad I didn't really want to go and it was [Robbins'] day off and I just didn't care to go that day. But he said he was going to go ahead and go over there anyway."

Out of concern for his elderly father, Marca decided to help, whether or not Robbins agreed to go along. Marca wanted Robbins to go with him, because "he was helping me on the job through the week or during his work hours" and because Marca had given him permission to salvage some piping and concrete blocks for himself. Robbins did not receive additional compensation for the task, and he would not have been fired if he had refused to do it.

At the barn, Robbins and Marca worked with Marca's father loading lumber into Marca's truck until about 2 p.m. No one was in charge of the salvage operation.

> "[Robbins] said that he had dismantled buildings for a living for a period of time. So he would know just as much about it as I did. My dad knew just as much about it as I did, so we were all kind of a teamwork-type situation."

After removing the wood, the three men attempted to tow an abandoned tractor, to allow access for the fire department that was going to burn the barn. Marca did not know which fire department was to burn the barn. He explained:

> "Q. Now, you said, mentioned earlier in your testimony that someone asked you or you were asked about moving this tractor, do you recall saying that to me earlier?
>
> "A. Yes, I do and I should go over that. That was my dad that asked me.
>
> "Q. Okay. When did he ask you about moving the tractor, was it on December 21 [the date of Robbins' death]?
>
> "A. I'm not sure. It might have been December 21 but it might have been a few days before but the tractor had to be moved before we left the job, it was part of the job to move the tractor.
>
> "Q. Why was that?
>
> "A. To move it out of the way so the fire truck could have access to the area.
>
> "Q. All right. Does your father have any relationship to the Coquille Rural Fire Department at all? Is he involved in that organization in any way?
>
> "A. Yes.
>
> "Q. In what capacity or does he have a capacity?
>
> "A. He is with the rural fire, Coquille Rural Fire District.

"Q. Is he actually a volunteer fireman himself or do you know?

"A. No, not a volunteer fireman.

"* * * * *

"Q. All right. And when you first undertook to move the tractor in relationship to the work you were doing earlier, salvaging boards and so on and so forth, was [moving the tractor] the last thing you were going to do that day?

"* * * * *

"A. Yes."

Marca's father said, "It's time to move the tractor." The three men undertook a cooperative effort to move it. Robbins was killed at about 2:30 or 3 p.m., when the tractor flipped over on him.

We recently stated the applicable principles this way:

"The ultimate inquiry under [the workers' compensation] statute is whether 'the relationship between the injury and the employment [is] sufficient that the injury should be compensable * * *.' *Rogers v. SAIF,* 289 Or 633, 642, 616 P2d 485 (1980). We have identified the following factors to help determine whether an injury is work-related:

" '(a) Whether the activity was for the benefit of the employer * * *;

" '(b) Whether the activity was contemplated by the employer and the employe either at the time of hiring or later * * *;

" '(c) Whether the activity was an ordinary risk of, and incidental to, the employment * * *;

" '(d) Whether the employe was paid for the activity * * *;

" '(e) Whether the activity was on the employer's premises * * *;

" '(f) Whether the activity was directed by or acquiesced in by the employer * * *;

" '(g) Whether the employe was on a personal mission of his own * * *.' *Jordan v. Western Electric,* 1 Or App 441, 443-44, 463 P2d 598 (1970). (Citations omitted.)

"All of those factors may be considered, and no one factor is dispositive. *Mellis v. McEwen, Hanna, Gisvold,* 74 Or App

571, 575, 703 P2d 255, *rev den* 300 Or 249 (1985)." *Preston v. SAIF,* 88 Or App 327, 330, 745 P2d 783 (1987).

Applying that standard, we hold that Robbins' injury did not arise in the course of his employment by Marca.

■ The trial court correctly determined that the *salvage work* was a part of Robbins' employment. He was not paid for that work; it occurred outside of regular working hours; and it took place away from the employer's property. Those factors weigh against the conclusion that the demolition of the barn was in the course of employment. On the other hand, the remaining factors weigh more heavily on the other side. The salvage operation was for Marca's benefit, albeit not for his exclusive benefit, because he intended to use the materials in his dairy business; Marca and Robbins specifically contemplated that Robbins would assist in demolishing the barn; obtaining lumber that could be used in the dairy business was incidental to Robbins' employment as a farm hand; Marca requested, and thereby acquiesced in, Robbins' participation in the salvage work; and Robbins was not on a personal mission, even though he also planned to benefit incidentally. He went to the salvage site only at his employer's express request and in his employer's company.

■ *Moving the tractor,* however, was not shown to be an integral part of the salvage project and, therefore, was not a part of Robbins' employment.[4] On this record, moving the tractor was entirely for the benefit of the fire department, not Marca. Although earlier parts of the demolition had been done during Robbins' regular hours, there is nothing in the record to suggest that the tractor would have been moved during his regular working hours and nothing to suggest that Marca and Robbins specifically contemplated ahead of time that Robbins would help move the tractor. The record does not suggest that working around and moving tractors or similar equipment was

---

[4] The trial court found

"that the tractor moving was part of the salvage agreement. For allowing the defendant Marca to salvage, the landowner wanted the tractor moved."

That finding apparently responded to an *argument* made to the court, but nothing in the *record* supports it. Progressive, as the "petitioner in a suit for declaratory relief[,] has the burden of proof as in any other suit." *Kassel v. City of Salem,* 34 Or App 739, 742, 579 P2d 875 (1978).

an ordinary risk of Robbins' regular work as a farm hand. He was not acting in the course of his employment when he died.

Reversed and remanded.